G. A. CHAPMAN, *Appellant,* vs. ST. STEPHENS PROTESTANT
EPISCOPAL CHURCH, INC., a corporation not for profit
under the laws of the State of Florida, and the TRUSTEES
OF THE DIOCESE OF SOUTH FLORIDA, a corporation not for
profit, under the laws of Florida, *Appellees.*

136 So. 238.

138 So. 630.

139 So. 188.

En Banc.

Opinion filed July 21, 1931.

Petition for rehearing denied September 14, 1931.

Mandate recalled January 6, 1932.

Order granting rehearing filed January 27, 1932.

Opinion on rehearing filed January 9, 1933.

684

*Blackwell & Gray,* for Appellant;

*R. A. Johnston,* for Appellee.

On motion to recall a mandate for further consideration of a judgment rendered at the present term (See 136 So. 238). Mandate recalled.

*R. A. Johnston,* of Miami, for the Motion;

*Francis B. Winthrop,* of Tallahassee, and *Blackwell & Gray,* of Miami, contra.

DAVIS, Commissioner.—The appellant filed his bill in the circuit court of Dade County, for the foreclosure of a lien claimed by him for labor performed on and for materials furnished for repairing and enlarging church property used and occupied by St. Stephens Protestant Episcopal Church, Inc., of Coconut Grove, but the legal title to which was in Trustees of the Diocese of South Florida, a corporation.

The latter corporation was created by act of the Legislature under the name of ''The Protestant Episcopal Church in the Missionary Jurisdiction of Southern Florida'' with full power to acquire property for the use of the Protestant Episcopal Church in the Missionary Jurisdiction of Southern Florida, or of any institution controlled by said church.

The act among other things provides that no property used for parochial purposes shall be alienated or encumbered without the written application or consent of the constituted authorities of the parish and that it shall not be lawful for any parish or the corporate officers or congregation thereof to encumber, sell, transfer or convey any real property without the consent of the corporation. Later the corporate name was duly changed to ''The Trustees of the Diocese of South Florida.''

In the charter creating the defendant St. Stephens Protestant Episcopal Church Inc., a corporation (which was in 1925) the corporation acknowledged itself to be a member of the Protestant Episcopal Church in the Diocese of South Florida, and adopted Constitution, canons, doctrine, discipline and worship of the Protestant Episcopal Church in the United States of America and also the Constitution and canons of the said Church in the Diocese of South Florida. The Charter of the last-named corporation provides that the officers by whom the affairs of the corporation are to be managed are a Rector, and a Vestry composed of not less than five lay baptized male members of the corporation, one of whom shall annually be appointed Senior Warden by the Rector, and one shall be elected Junior Warden. The Vestry shall also elect annually a secretary and a treasurer. The charter also provides that

"No grant shall be made nor shall any *change* (charge) be imposed upon any consecrated church or chapel or any church or chapel which has been used solely for divine service belonging to the Parish, except by the consent of a majority of the whole Vestry at any regular or special meeting, nor without the consent of the Bishop acting with the advice and consent of the Standing Committee of the Diocese."

At the time the property in question was acquired by the church, the organization at Coconut Grove was a mission under the Protestant Episcopal Church in the Missionary Division of South Florida. The clergyman then in charge of the mission raised certain money by subscription which, added to money obtained as a result of the sale of property it already had, was paid for the purchase of the property in question, and the title to the property was made to "The Protestant Episcopal Church in the Missionary District of Southern Florida." In his testimony, the said clergyman states that

"A mission cannot hold property, not being a corporate body, it had to be held by a trustee or Diocese. * * The custom was for the diocese of mission jurisdiction to hold title to all mission property."

When the Coconut Grove church was incorporated, it continued to use the same property.

On June 5, 1923, the Trustees of the Diocese of South Florida at a regular meeting resolved

"That whenever a parish shall incorporate under the standard form of charter which has been prepared by the Chancellor the Bishop shall convey * * * to the incorporated parish the property held by this corporation for such parish, provided that this resolution shall not apply to any property which is held by this corporation on any express trust."

The church building and rectory belonging to St. Stephens Church were seriously damaged in the hurricane of September, 1926, and it became necessary to do something at once to avert greater loss. Being unable to get together a majority of the vestry, members thereof—less than a majority—authorized certain work to be done on the rectory so that it could be occupied by the rector who was then out of the city, but would return in a few days. On October 8th, following, at a meeting of the vestry, a majority being present, it was moved

"That a committee be appointed, with full power to act, to consider widening the church to the South as far as the present North line of the sidewalk and to extend the back wall to a line with the extreme Eastern Wall of the present church building. The idea being to make no changes in the chancel, pulpit or the position of the organ console, but to arrange for a wall to extend across the new structure in a line with the wall at the right hand side of the sanctuary; this wall having a door from the church to the new space, which will be developed up into rooms for the choir and providing more room in the Vestry."

Upon the motion being carried, Mr. Gray and Mr. Oemler, the latter being an architect, were appointed as

a tentative committee to be approved by the Rector. A motion was then made and carried that the committee be instructed to o.k. all bills for payments and the treasurer was authorized to pay all bills so approved. It seems that committeeman Gray was not very active in looking after the repairs that were made, although he stated that he was on the property about every day, and it is not in evidence that he o.k.'d any bills. Committeeman Oemler went ahead and made a verbal contract with the complainant to do the work on a cost-plus basis. No plans or specifications were made other than a drawing of the alterations to the church building and this was changed somewhat. During the progress of the work, the vestrymen generally were on the property every Sunday and some of them were there two or three times a week. The Rector returned the latter part of September or the first part of October and was there probably every day where he could, and sometimes did, consult with Mr. Oemler. Checks were drawn periodically to cover payrolls and material until some time in November when $10,850.00 had been paid on the work, while the contractor had paid out the sum of $15,597.47. Thereupon, the complainant was notified to cease work. He then demanded payment of the balance due him which added to the percentage claimed by him amounted to $7,087.09, and payment was refused.

The master reported that complainant was entitled to a lien upon the church property for the payment of said amount together with interest thereon from November 26, 1926, and recommended that a decree be entered in favor of the complainant. The court sustained certain exceptions filed by St. Stephens Protestant Episcopal Church Inc., and dismissed the bill.

We deem it established by the evidence that a contract was made with the complainant to do the work for the St. Stephens Protestant Episcopal Church Inc. on a cost-plus

basis; that the complainant in good faith spent upon the work the sum of $15,597.47 of which amount he was paid $10,850.00; that the defendant St. Stephens Protestant Episcopal Church Inc. then had and continued to have possession and enjoyment of the property; that, to use the language of Bishop Mann, whose testimony was taken before a commissioner, "repairs of that sort are made by the rector and vestry. They don't have to consult the Bishop on the matter," from which we deduce that the Rector and Vestry had general authority under the church law to make such improvements, if it was in the power of the trustee to withhold it from them; that certain work was done which was not covered by the quoted resolution of the vestry, but that it was done under the supervision of Oemler, and the cost of this extra work is not apparent from the record; that the defendant, Trustees of the Diocese of South Florida, held the legal title in trust for the use of the Coconut Grove Church, the beneficial owner, and that said church could have obtained the legal title to the property in its own name at any time after it became a corporate entity.

Under the terms of the resolution of the Vestry no limit was placed on the amount that was to be spent in repairing and making additions authorized to the property, nor was any detailed plan adopted by them.

If there was any protest made or dissatisfaction shown during the progress of the work on the part of the Rector and Vestry as to the work that was done, the cost of it, or the manner in which it was done, the record does not reveal it.

Under the circumstances disclosed by the record, St. Stephens Protestant Episcopal Church Inc. had the right to make a binding contract for repairs and additions to the church property.

It is not argued here that the Vestry did not have the

power to appoint a committee to see that the work was done, but it is insisted that one of the committeemen, alone had no right to make a contract with complainant, and that because the other member of the committee knew nothing of such a contract, it was not binding on St. Stephens Protestant Episcopal Church, Inc.

"Liens prior in dignity to all others accruing thereafter shall exist in favor of the following persons, upon the following described real estate, under the circumstances hereinafter mentioned, to-wit (Sec. 5349 (3495) Compiled General Laws of Florida, 1927) * * *

"In favor of any mechanic, laborer or other person who shall perform by himself or others any labor upon, or in the construction or repairs of any building or other work or structure, or additions to or upon any fixtures therein or thereon; upon such buildings, work or structure and the land upon which it stands. (Sec. 5350 (3496) Compiled General Laws of Florida, 1927) * * *

"In favor of any person who shall furnish any building material for the construction, repair or use of any building, fence, railroad, canal or telegraph line, wharf, bridge, mill, distillery or other manufacturing work or structure, upon the said buildings, lines or other property, and upon the lands upon which they stand. (Sec. 5353 (3499) Compiled General Laws of Florida, 1927. * * *

"As against the owner, absolute or limited, of the property, real or personal, upon which a lien is claimed, or person deriving through his death, or purchasers or creditors with notice, the lien hereinbefore provided for shall be acquired by any person, in privity with such owner, by the performance of the labor or the furnishing of the materials. Any purchaser or creditor whose title, interest, lien or claim in or to the property shall be created, or shall arise, while the construction or repair of such property as aforesaid is in progress shall be deemed and held to be a purchaser or creditor with notice. * * * " Section 5380 (3517) Compiled General Laws of Florida, 1927.

There is nothing in the statute that excepts church property from the above-quoted provisions though it has been held, in other jurisdictions that a mechanic's lien cannot be acquired on a church building. The weight of authority however sustains the right to a mechanic's lien against such property. 18 R. C. L. 884; 40 C. J. 60; See Notes in 78 Am. Dec. 696; 51 L. R. A. (N. S.) 161 and Ann. Cas. 1915D 1145; 20 A. & E. Ency. Law (2d. Ed.) 289.

In the instant case the trustees of the Diocese of South Florida held merely the legal title and the St. Stephens Church was the beneficial or equitable owner of the property.

> "In case of a simple or dry trust a mechanic's lien may exist for labor performed or materials furnished under or by virtue of a contract with, or the consent of the equitable owner of the property; but where a trustee has power to manage and control the trust property, a contract with the cestuis que trust alone, not consented to or approved by the trustee, is not sufficient as a basis for a mechanic's lien." 40 C. J. 110.

As a general rule an equitable as well as the legal owner of property may create a mechanic's lien. The word "owner" includes the owner in equity as well as at law. Phillips on Mechanic's Liens (3d Ed.), Secs. 67, 188; 20 A. & E. Ency. Law (2d Ed.) 330; Goldheim v. Clark, 68 Md. 498, 13 Atl. 363; Seitz v. Union Pacific Ry. Co., 16 Kan. 133; Springer v. Kroeschell, 161 Ill. 358, 43 N. E. 1084.

While it has been held here that persons who desire to avail themselves of mechanics' and laborers' liens should take care to inform themselves with whose estates they are dealing, when they make contracts and perform their labor (National Bank of Jacksonville v. Williams, 38 Fla.

305, 320, 20 So. 931), it is also true that the owner is estopped to deny the agency where, without repudiating it he stands by and expressly consents to, or silently acquiesces in contracts for improvements entered into with a person who claims to be his agent. Also, the owner may, under the circumstances of the case, be estopped to deny the authority of his agent to enter into the contract, 40 C. J. 97. Furthermore, a corporation, the same as a natural person, may ratify and become bound by an unauthorized contract made on its behalf by its agent, if the contract is within the scope of its corporate powers and might have been previously authorized by it, (14a C. J. 373) and ratification "may be implied from the acquiescence in, or recognition of, the act by the corporation through its proper officer or agent, or from its accepting and retaining the benefits of the act, or from any other acts or conduct which reasonably tends to show an intention to adopt or affirm the act or contract, particularly where it appears that the corporation has repeatedly recognized and approved similar acts done by the officer or agent, and provided that at the time of such acts or conduct it has full knowledge or the material facts; and where the unauthorized act or contract is clearly beneficial to the corporation, a ratification may be implied from slight circumstances." 14a C. J. 382, 387. See also Atlanta & St. Andrews Bay R. Co. v. Thomas, 60 Fla. 412, 424, 53 So. 510, and Annotation, 7 A. L. R. 1446, et seq.; 2 Jones on Liens (3d Ed.) 451.

Where authority is conferred upon two or more agents to represent their principal in a business transaction, it is the general rule that such an agency will be presumed to be joint, and it can be performed by the agents only jointly unless an intent appears that it may be otherwise executed; but if it appears from his course of dealing or subsequent approval that the principal has waived the re-

quirements of joint action on the part of the agents by allowing a number less than the whole to act for him, the execution of the power by a number less than all will be valid. 1 Mechem on Agency (2d Ed.) Sec. 198; 2 C. J. 668.

Inasmuch as the management of the affairs of St. Stephens Episcopal Church devolved upon the Rector and Vestry, and they, with the "consent of the Bishop, acting with the consent of the standing committee of the Diocese" had the power to impose "changes" (charges) upon the church property, it seems to us that when Bishop Mann testified that "repairs of that sort are made by the Rector and Vestry," this statement, uncontradicted, taken in connection with the evidence in the record relating to the conduct of the Rector and Vestry, authority was clearly shown for making the said improvements. If Oemler was not duly authorized by the Rector and Vestry to make the alleged contract with the appellant, the officers of the church either had actual knowledge of what he did, or they should have known because it was their duty to know it, and "negligent ignorance has the same effect in law as actual knowledge." Redstone v. Redstone Lumber & Supply Co., 101 Fla. 226, 133 So. 882. By acquiescing therein and accepting the benefits flowing therefrom, they ratified Oemler's acts and now are estopped to deny his authority to bind the St. Stephens Episcopal Church.

It follows that the appellant had, at the least, a lien upon the interests of the St. Stephens Episcopal Church in the property, and since the Rector and Vestry of the said Church had the authority of the defendant, the Trustees of the Diocese of South Florida, to make "repairs of that sort" (to the Chapel and Rectory) we hold that the lien is upon the whole of said property and that appellant has a right to have it enforced.

The decree appealed from is reversed and the cause is remanded with directions to enter a decree for the complainant in accordance with the views herein expressed.

PER CURIAM.—The record in this cause having been considered by the Court, and the foregoing opinion prepared under Chapter 14553, Acts of 1929, adopted by the Court as its opinion, it is considered, ordered and decreed by the Court that the decree of the court below should be, and the same is hereby reversed, and the cause is remanded with directions to enter a decree for the complainant in accordance with the views herein expressed.

BUFORD, C.J., AND WHITFIELD, ELLIS, TERRELL, BROWN AND DAVIS, J.J., concur.

---

MANDATE RECALLED JANUARY 6, 1932.

PER CURIAM.—Section 4690 C. G. L., 2961 R. G. S., provides that the Supreme Court shall hold two terms in each year, commencing, respectively, on the second Tuesday in January and June. In accordance with this statute a regular term of the Supreme Court began on June 9, 1931.

On July 21, 1931, judgment was entered in this cause reversing a decree of the Circuit Court of Dade County in a suit for foreclosure of lien and directing that a decree be entered by the Circuit Court for the complainant in the Court below. The original decree was for the defendant and appellee, St. Stephens Protestant Episcopal Church, Inc. On August 15, 1931, a petition for rehearing was filed by the appellee. This petition was in the form and filed within the time required by the rules of this Court. On September 1, 1931, said petition for a rehearing was denied by a majority of the Court. On September 16, 1931, mandate was issued in accordance with this Court's judgment of reversal. Thereafter said mandate was duly filed in the Circuit Court of Dade County. On November 13, 1931, appellee filed in this Court its motion

to recall the mandate heretofore sent to the Circuit Court of Dade County and that all proceedings thereunder be stayed in order that this Court might give further consideration to the judgment of reversal for the purpose of rehearing and modifying it to accord with the law and justice of the present cause.

Appellee's motion to recall the mandate and reconsider and modify or reverse the judgment of reversal which was entered by this 'Court on July 21, 1931, is proposed by the appellant. As grounds for such opposition the appellant contends that after this Court denied the appellee's petition for a rehearing and issued its mandate thereon and such mandate was duly lodged in the Circuit Court for Dade County that all jurisdiction of this Court absolutely ended at the time the mandate was lodged in the lower Court and that this Court has no jurisdiction to order that such mandate be recalled for the purpose of reinvesting itself with power to have further proceedings with respect to the appeal which was finally determined according to the judgment of this Court entered July 21, 1931, and the denial of a rehearing on September 14, 1931.

In support of the contention that this Court has no jurisdiction to recall the mandate under the circumstances, appellant cites and relies upon the cases of Lovett v. State, 29 Fla. 384, 11 So. 176; Brown v. State, 29 Fla. 494, 11 So. 181; and Merchants National Bank v. Grunthal, 39 Fla. 388, 22 So. 685.

But the question now before the Court is whether or not the jurisdiction of this Court ends before the expiration of the term, at the time the mandate is lodged in the lower Court, the time for rehearing having expired, or a rehearing having been applied for and been denied in due course.

It is generally held, in the absence of statute, that the power of an appellate court over its judgments, like that of courts generally, persists to the end of the term at which

the judgment is rendered, and then absolutely terminates. See Ott v. Boring 131 Wis. 472, 111 N. E. 833, 11 Ann. Cas. 857; Franklin & Co. vs. Mackey, 158 N. Y. 683, 51 N. E. 178.

For the purposes of the present motion, which is an extraordinary one to recall the mandate and grant a rehearing with regard to a judgment rendered in a case decided at the present term, it has been assumed that the judgment of this Court reversing the decree of the Circuit Court was erroneously entered by this Court, at least to the extent that it directs a particular decree to be entered in favor of the appellant.

If that proposition be true (which, of course, is not decided but only assumed for the purpose of the present motion), the question which we must determine narrows itself down to the proposition as to whether or not the Supreme Court of Florida has *jurisdiction or power* to modify or change its own judgment of reversal during the term at which such judgment was rendered, when it is made to appear to this Court that it has committed an error which requires such change of its judgment in order to prevent a miscarriage of justice, even though a mandate has been issued and lodged in the Circuit Court.

To hold in the negative would be to announce the remarkable doctrine that errors committed by the Supreme Court of Florida are the only errors in the entire scheme of government for which no remedy can be found, where relief therefrom is seasonably applied for by an injured party. To hold to such a rule would be to declare that the Supreme Court of Florida has power to correct the errors of all other tribunals and departments of the government, while faithfully adhering to and perpetuating its own.

As late as the case of Washington vs. State, 92 Fla. 740, 110 So. 259, opinion filed October 12, 1926, this Court said: "It is not necessary for us now to determine the question

as to whether or not the jurisdiction of this Court ends before the expiration of the term, at the time the mandate is lodged in the lower court, the time for rehearing having expired.'' This declaration found in the opinion of MR. JUSTICE BROWN in that case would seem to imply that the Court did not consider that. the case of Merchants National Bank v. Grunthal, *supra;* Lovett v. State, *supra;* and Brown v. State, *supra,* relied upon and cited by the appellant in this case were in point, or controlling, on the proposition as to whether or not the jurisdiction of this Court ends before the expiration of the term, at the time the mandate is lodged in the lower court, merely because such mandate has been issued and filed in the court from which the appeal was taken.

But, be that as it may, a majority of the Court have reached the conclusion that the correct rule, which should be recognized and applied in such situation, is that the jurisdiction of this court, like the jurisdiction of courts generally, persists to the end of the term and then terminates, but that during the term at which a judgment of this Court is rendered, this Court has jurisdiction and power which it may exercise, as the circumstances and justice of the case may require, to reconsider, revise, reform or modify its own judgments for the purpose of making the same accord with law and justice, and that it has power to recall its own mandate for the purpose of enabling it to exercise such jurisdiction and power in a proper case.

Some members of the Court are of the opinion that the three cases cited and relied upon by appellants hold to the contrary, and that they are accordingly in point and should be followed here. Other members of the Court are of the opinion that our three previous cases decided a different point and were not intended to hold that this Court loses the power to control its own judgments *during the term at which they are rendered* inasmuch as such

power is a power which is universally recognized to reside in courts generally.

But a majority of the Court as at presnet constituted, are of the opinion that if the three Florida cases* previously cited and relied upon by the appellant *are* to be construed as holding that this Court loses jurisdiction over its own judgment before the expiration of the term, at the time the mandate is lodged in the lower Court, that such holding is contrary to the holdings of the better reasoned cases on the subject, and therefore should be overruled insofar as the same may conflict with the generally recognized law on the subject of jurisdiction of appellate courts. This rule is to the effect that jurisdiction of the appellate court over its own judgments, like that of courts generally, persists to the end of the term at which the judgment is rendered, and then absolutely terminates, in the absence of statute, or rule having the effect of a statute, in force to the contrary, and that the appellate court in a proper case may recall its mandate, and reassume jurisdiction over its own judgments during the term at which they were entered. See Franklin Bank Note Co. v. Mackey, 158 N. Y. 683, 51 N. E. 178; 10 R. C. L. Sec. 351, page 563; 15 R. C. L. Sec. 143, page 690.

The motion to recall the mandate will therefore be granted and the cause reinstated on the docket for the purpose of giving further consideration to the judgment rendered at the present term, in order that it may be determined whether or not there is error in such judgment which should be corrected in order to prevent a miscarriage of justice.

Motion to recall mandate granted.

BUFORD, C.J., AND WHITFIELD, TERRELL, BROWN AND DAVIS, J.J., concur.

*Lovett v. State, 29 Fla. 384, 11 So. 176; Brown vs. State, 29 Fla. 494, 11 So. 181; Merchants National Bank v. Grunthal, 39 Fla. 388, 22 So. 685.

ELLIS, J., dissents.

ELLIS, J., dissenting.—This case is now presented upon a motion to recall the mandate to the end that a petition for rehearing may be submitted in behalf of the Appellees. The opinion and decision of this Court was filed July 21, 1931, in which a decree of the Circuit Court in favor of the appellees, defendants below, was reversed with directions to enter a decree for the complainant. A petition for rehearing in behalf of the appellees was filed August 15th following and denied on September 14th and the mandate from this Court was issued two days later. The motion was filed November 13th to recall the mandate. The judgment of this Court and the successive steps above mentioned all occurred during the present term.

The appellant resists the motion to recall the mandate upon the ground that this Court has lost jurisdiction of the cause by forwarding its mandate to the court whose decree it reviewed and therefore it has no authority to grant a second petition for rehearing filed subsequently to the lodgment of the mandate of this court in the lower court. The second petition for rehearing was filed in this Court upon the same day that the motion to recall the mandate was filed which was four months and twenty-two days after the judgment of this Court was filed and a month and twenty-seven days after the mandate was issued by the court but all during the present term.

There was no fraud perpetrated upon this Court nor was there any mistake or inadvertence upon its part in causing the mandate advising the trial court of the judgment of this Court to be issued and sent to the trial court unless indeed the court erred in denying the first petition for a rehearing. For the purpose of this discussion, therefore, it may be admitted that there was such error so that the question presented may be stated as follows: May a court of review at any time during the term at which a

judgment has been rendered and a mandate upon its judgment has been duly lodged in the court whose judgment was reviewed recall the mandate where there has been no fraud, accident or mistake in its issuing to the end that the reviewing court may consider again alleged errors pointed out in its judgment or reversal or affirmance?

The terms of this Court are two in each year commencing respectively on the second Tuesday in January and June. Sec. 4690 C. G. L. It is within the reasonable limit of probabilities therefore that a judgment of reversal, such as the one entered in this case, or of affirmance, to be enforced by the trial court and the subject matter of the litigation disposed of and the rights of third persons thereto become vested within the period of one term of this Court. May the power of the Court to recall its mandate under the circumstances above mentioned be affected by such a condition so that it could not be exercised? If so does not the possibility of the happening of such an event afford the reason why the reviewing court has no power to recall its mandate in the absence of fraud, accident or mistake in its issuing which would *per se* invalidate it? In the event of a recall of the mandate to correct errors in its issuing the change or correction of the mandate should be made at the term in which it was issued. 13 Ency. Pl. & Prac. 865.

In the case of Merchants Nat. Bank of Jacksonville v. Grunthal, 39 Fla. 388, 22 South. Rep. 685, writs of error were dismissed because the plaintiff in error had failed to exhibit by the record any matters assigned in error in such manner as the court was authorized to recognize or consider them. The plaintiff in error contested the motion to dismiss but made no effort under the rule to suggest a diminution of the record or to supply the "palpable and fatal defects and omissions therein."

Subsequently to the dismissal of the two causes and within the same term of the court the plaintiff filed motions to reinstate the cases upon the docket and for leave to file a motion suggesting diminutions in the records and for a certiorari to bring up the corrected record. Those motions were denied at the same term. The reason given by the court was that certiorari to amend defects in records will not be awarded after the dismissal of a cause. Thereupon after denial of the applications for rehearing and reinstatement of the causes they were remitted to the court below by mandates.

During the same term of the court, after a denial of the former application for a rehearing and reinstatement of the causes, the plaintiff in error made its second application for recall of the mandates and for reinstatement of the causes. There were eleven grounds given why the court should allow the application, the first being because the court had power to do it. The remaining grounds rested upon alleged denial of plaintiff in error's rights under the constitution, laws and court rules, by the court's action in dismissing the causes.

The Supreme Court at the following term denied the application specifically holding that "because the mandate of this court having been regularly issued and sent to and filed in the court below in said causes, this court has no further jurisdiction to grant a rehearing or other relief therein." The application was denied "with reluctance," said the court. There were two other reasons given, however, one of which went to the court's practice under a rule and the other to the propriety of granting an application for rehearing by the same party on the same grounds as a former application that had been considered and denied. No point was made of the fact that the final action of the court was taken at the term following that in which the mandate went down but was placed squarely

upon the proposition that the mandates having been sent down the Supreme Court had no power to recall them although the application to recall them was made *during* the *term* in which the *decision* was rendered. If the court had entertained the view that it had power over its mandate regularly issued without error or mistake to recall it at any time during the term at which the judgment was rendered, it would seem that as the application for its recall was made within the term the order would have been made to take effect as of the date the application was submitted, as the court denied it with reluctance.

In Brown v. State, 29 Fla. 494, 11 South. Rep. 181, judgment was reversed because the record proper did not show that the jury were sworn. After the mandate was issued and filed in the Criminal Court the Attorney General moved to vacate the judgment of reversal and suggested a diminution of the record to correct the error appearing in the record. The court denied the motion holding that it had lost jurisdiction of the writ of error and cannot disturb or reconsider that decision. The court said nothing else was before it. In that case it was pointed out that there was no error of law in the decision but the exercise of jurisdiction was regular and not the result of mistake, surprise of fraud.

In the case of Lovett v. State, 29 Fla. 384, 11 South. Rep. 176, where the court entered judgment reversing the judgment of the circuit court, issued its mandate and the same was filed in the office of the clerk of the circuit court, the cause was recalled and restored to the docket for further proceedings on motion of the Attorney General based upon the ground that the transcript of the record on which the court acted was not a correct and true transcript of the record. Mr. Chief Justice Raney wrote the opinion for the court in each case. In the latter case the decision rested upon the theory that the false record was brought

to the court by the convict, the court's judgment was improvidently entered because of the imposition upon the court which amounted to a fraud upon its jurisdiction. It was held to be not the judgment of the court upon the true cause of the plaintiff in error.

The Lovett case, *supra,* is authority only for the proposition that when the judgment of the reviewing court has been obtained by a kind of fraud on the court, or where it is entered not upon the true case of the party applicant, the mandate will be recalled on the theory that the judgment is improvident or result of error committed not by the court but by others charged with the duty of presenting a correct transcript of the record.

In the case of Nickels v. State, 86 Fla. 208, 98 South. Rep. 502, writ of error was taken to an order of the Circuit Court denying a writ of error coram nobis which order was affirmed and the mandate sent down. Afterwards, but during the same term, the court recalled the mandate in order that the cause be reinstated upon the docket and a rehearing be granted upon the question presented. It was said by this court in Washington v. State, 92 Fla. 740, 110 South. Rep. 259, that the action in the Nickels case, *supra,* was taken under the "general power vested in courts to control orders and judgments rendered during the term at which such control is exercised."

The general language used in the Washington case is not in strict harmony with that used in Merchants Nat. Bank of Jacksonville v. Grunthal, *supra;* nor in line with Brown v. State, *supra.* In the Lovett case, *supra,* the element of fraud entered so as to render the judgment improvident, the result of error committed by one benefited by the judgment of the Supreme Court.

In the Lovett case, *supra,* Mr. Chief Justice Raney, speaking for the Court, used the following language:

"Where a case has been heard upon its merits in an

appellate court according to its rules of practice, and the judgment of the court has been correctly entered, and, the time, if any, allowed by statute or its rules for a rehearing having passed, and, no application for a rehearing having been made, the *remittitur* issues and is lodged in the lower court, it may well be said that the appellate court has lost its jurisdiction of the cause, and has not power to recall or reconsider it. Under these circumstances it has fairly and duly exercised its appellate functions and exhausted its powers as to the cause. There must be an end of litigation; public policy as well as the interests of individual litigants, demands it, and the rule just announced is indispensable to such a consummation.''

In the Brown case, *supra,* the application for recall of the mandate was made during the term of the Supreme Court at which the judgment in that case (See 29 Fla. 543) was rendered. Mr. Chief Justice Raney, speaking for the court in that case, said:

''all we decide now is that we have lost jurisdiction of the writ of error, in which our judgment was rendered, and *cannot disturb* or *reconsider* that *decision.* Nothing else is before us.'' (Italics mine).

In neither the Nickels case, *supra,* nor the Washington case, *supra,* was the question of recalling a mandate involved. In each the question was on the matter of granting a permit to file in the court below, whose judgment had been affirmed, an application for a writ of error coram nobis. There is no limitation in point of time upon the trial court to issue a writ of error coram nobis but when the judgment of the trial court has been affirmed by the reviewing court the judgment is that of the latter court and must be executed according to its decision, so that permission from the reviewing court is essential to permit the trial court to grant a writ of error coram nobis. Neither is it of any importance that the reviewing court denied one such application. It has the power without reference to its judgment on the first application to grant a second

at any time when it is made apparent that the judgment entered could not have been entered if certain conditions had been made known to the court.

The question in this case, therefore, is as stated in this opinion in the first part of it. The case was brought here in due course, it was decided by this Court and the judgment entered, a rehearing denied and the mandate sent down. There is no error in the transcript of record, no fraud, actual or constructive, perpetrated on the court and no clerical misprision in issuing the mandate. But it is assumed that this Court erred in reversing the Chancellor and ordering a decree for the complainant to be entered because the evidence as disclosed by the record amply supported the Chancellor's decree.

This Court will, as any reviewing court would, avail itself of any power at its command to correct any error in its decisions whether on the merits or on any matter of procedural law if the right of the complaining party were affected, but now it is a question of power. May this Court recall its mandate in the circumstances stated to review its judgment even though that judgment may rest upon error in overlooking portions of the record which if considered would reveal its error?

The general rule is that an appellate court cannot recall its mandate after the filing thereof in the court below except for the correction of an irregularity, error or inadvertence in granting it. See 13 Ency. Pl. and Prac. 865; Blanc v. Bowman, 22 Cal. 24; People v. Sprague, 57 Cal. 14\(\); Rud v. Brd. of Com'rs of Pope County, 66 Minn. 358, 68 N. W. Rep. 1062, 69 N. W. Rep. 886; Ah Lep v. Gong Choy, 13 Oregon 429, 11 Pac. Rep. 72; Underhill v. Town of Jericho, 66 Vt. 183, 28 Atl. 879; Killian v. Ebbinghaus, 111 U. S. 798, 28 L. Ed. 592, 4 Sup. Ct. Rep. 698; Thomas v. Thomas, 27 Okla. 784, 109 Pac. Rep. 825, 113 Pac. Rep. 1058, 35 L. R. A. (N. S.) 124.

The rule above quoted rests largely upon the doctrine that when the reviewing court regularly, without inadvertence or fraud proceeds with the consideration of a case, determines it and retransmits it to the court from which it came, loses jurisdiction and the jurisdiction of the trial court which was suspended during the appeal becomes re-established, and both courts cannot have jurisdiction over the cause. To require courts to consider and reconsider cases at the will of litigants would deprive the courts of that stability which is necessary in the administration of justice. See Ott v. Boring, 131 Wis. 472, 110 N. W. Rep. 824, 111 N. W. Rep. 833, 11 A. & E. Ann. Cas. 857.

The State of New York seems to hold a different principle and maintains that the reviewing court may determine whether it will resume jurisdiction for any purpose and where it has done so it will request the court below to return the remittitur but before it can proceed further it must be repossessed of the remittitur. That State however seems to be alone in maintaining that doctrine which was criticised in Ott v. Boring, *supra,* as opposed to authority.

The New York doctrine seems to rest not on the power of the court to recall its mandate but upon considerations of expediency that urge the correction of errors that may have been committed by the appellate court in hastily disposing of its business. "This court has no appellate jurisdiction over its own judgments; it cannot review or modify them after the case has once passed, by the issue of the remittitur from its control. The court cannot recall the case and reverse its decision after the remittitur is issued" unless, as pointed out, inadvertence or mistake has been made in issuing it or fraud has occurred to procure the judgment. Inadvertence or haste in deciding the

case affords no ground for the exercise of a power that does not exist.

The motion to recall the mandate should be denied.

DAVIS, J.—As has been stated in the very able opinion of MR. JUSTICE ELLIS, the question we are now discussing is one of power, not one of procedure. It is admitted that all courts of general jurisdiction have *power* to correct their own judgments during the term at which they were rendered. It is also admitted that this power of the courts to correct their own judgments during the same term not only can be, but should be *exercised* when a failure to exercise them will likely result in a miscarriage of justice.

It is argued that the power of this court over the pending cause ended when its mandate reversing the decree of the Circuit Court and ordering a different decree, was remitted by this Court to the Circuit Court and then lodged with the Circuit Court.

Such mandate, however, was only issued pursuant to the rules of this court which provide for the issuance of mandates in advance of the legal conclusion of its regular terms prescribed by statute. Ordinarily mandates of an appellate court will not be issued until the end of the term, because of the jurisdiction and control of the judgment, of which such mandate is merely evidence, is retained by this Court during the term.

My conception of the law therefore is that if this Court retains jurisdiction over its own judgments until the end of the term, that if there is any lack of *power* in this court in the matter now before the bar, the lack of power lies in the inability of this court by its own rules to foreclose its admitted jurisdiction by providing for the sending out of its mandate in advance of the end of its terms.

This Court exercises general constitutional jurisdiction as an appellate court. It is conceded that as a constitu-

tional court of general appellate jurisdiction it retains control and jurisdiction, with power to change or modify, its own judgments during the same term. To now hold that it has lost jurisdiction by the issuance of its mandate is to hold that this Court by passing a rule providing for the issuance of mandates before the end of its terms delimited and narrowed its own constitutional jurisdiction over its own judgments during the same term, which would otherwise have remained but for such rule.

I do not question the power of this Court as a matter of procedure to prescribe a rule that mandates shall be issued at the end of thirty days, whether the term is ended or not, unless there is a petition for a rehearing pending. My thought in this connection, is that while such a rule may be passed as a matter of *procedure,* and should be observed by the Court and enforced by the court like all of its other rules of *procedure,* that nevertheless it is only a rule of procedure and where there is a conflict between the application of such a rule of this Court and the constitution of this State which gives this Court jurisdiction to enter judgments and to retain and exercise control over them during the term, that such rule must be understood as being in subordination to the constitutional *power* of this Court to do that which in the administration of justice, and in order to prevent a miscarriage of justice in a particular case, ought to be done.

I am unable to find anything in Brown v. State, 29 Fla. 494, 11 Sou. Rep. 181, which holds to the contrary. It is true that in that case this Court held that it had lost jurisdiction of the writ of error on which a judgment had been reversed and that it could not disturb or reconsider that decision after the mandate had been issued and lodged in the court below, even though motion was made in the Supreme Court to that effect during the term in which the judgment of reversal was rendered.

But the Brown case is easily distinguishable from the situation here. In the first place, no effort was made to have the mandate recalled from the Criminal Court of Record. The court was asked generally to reconsider and revise its judgment of reversal, while the mandate of reversal remained on file in the court below. Furthermore, it was expressly admitted by the Attorney General in that case, as we find from an inspection of the original court files in the archives of this Court, that the transcript of the record upon which the judgment of reversal was rendered *was a correct transcript* and therefore the judgment of reversal entered by the appellate court on such transcript *was a correct judgment by the appellate court.*

It was never contended in that case that there was any error or miscarriage of justice involved in what was decided by the Supreme Court. The error which was insisted upon in that case was an error on the part of the clerk of the Criminal Court of Record in failing to have the trial court's record show that the accused was present at all stages during the trial. The purpose of the Attorney General's motion was not to ask the Supreme Court to correct its own error after the mandate had been sent down following a judgment of reversal, but was to ask the Supreme Court to reverse its admittedly correct judgment on the record before it by permitting the record on appeal to be amended so as to show that the error which appeared in it did not exist.

In this connection it must be noted further that the rule followed in the Brown case is that the court below, after the mandate is filed, cannot introduce into its records facts showing that the judgment of the appellate court reversing the case was erroneous and ought not to be changed because of something that was never before the appellate court and which did not exist as a matter of record when the appellate court's decision was handed down and which

likewise did not exist of record in the lower court when the appellate court's decision was handed down. The files in the Brown case show that counsel for Brown cited in support of this rule the case of Livingston vs. Story, 12 Peters 339.

What this Court did in the Brown case was merely to hold that when a criminal conviction for felony has been properly considered by the Supreme Court on a record which is in fact *a true record of the proceedings in the court below, and the judgment* has been properly reversed by the Supreme Court on such record, that the court below has no jurisdiction to amend the judgment thus annulled by the Supreme Court, so as to make a new record upon which the Supreme Court can reconsider and reverse its own judgment, after it has once exhausted its appellate jurisdiction in a proper case decided on a proper record. The Brown case wholly failed in every respect to deny the power of the Supreme Court to exercise control over its own judgments at all times during the same term at which said judgments were rendered, merely because a mandate in conformity with such a judgment had been issued and lodged in the lower court.

The Lovett case, 29 Fla. 384, 11 Sou. Rep. 176, 16 L. R. A. 313, was decided at the same term of this Court as the Brown case, and the opinion in the Lovett case was written by CHIEF JUSTICE RANEY, who also wrote the opinion in the Brown case. In the Lovett case the rule governing these matters was stated to be that where a case has been heard upon its merits in an appellate court according to its rules of practice, and the judgment of the appellate court *has been correctly entered, and the time, if any, allowed by statute or its rules for a rehearing has passed, and no application for a rehearing has been made,* and the mandate issues and is lodged in the lower court, it may be said that the appellate court has lost its jurisdiction

of the case, and has no power to recall or reconsider it, because under these circumstances it has fairly and duly exercised its appellate functions and exhausted its powers as to the cause. (See 29 Fla. text 401).

It was there said that this was the rule, because there must be an end of litigation; that public policy, as well as the interests of individual litigants, demand it, and that the rule just announced is indispensable to such consummation.

But, as will be noted, the statement of the rule laid down in the Lovett case contemplates that the judgment of the appellate court *must have been correct when entered.* It by no means follows that if the judgment of the appellate court is not correct, that the appellate court, merely to put an end to litigation, must preserve and perpetuate its own errors in the interest of public policy.

In the case of Merchants' National Bank v. Grunthal, 39 Fla. 388, 22 Sou. Rep. 685, the fourth headnote reads:

"When the mandate of the appellate court has been regularly issued and sent to and filed in the court whose judgment it has reviewed, such appellate court has no further jurisdiction over the case to grant a rehearing or other relief therein."

A better and more exact statement of what was intended to be decided in that case would appear if said headnote read as follows:

"When the mandate of the appellate court has been regularly issued and sent to and filed in the court whose judgment it has reviewed, such appellate court has no further jurisdiction over the case to grant a rehearing or other relief therein, *when application to recall the mandate and grant a rehearing is presented to the Supreme Court at the subsequent term to that at which the judgment of the Supreme Court was rendered.*"

In Merchants' National Bank v. Grunthal, *supra,* as shown by the published opinion in the case and as also shown by the minutes of this court which have been ex-

amined to verify the fact, the judgment disposing of the case was rendered at the June Term, 1896, of this Court. On January 12, 1897, after the expiration of the June Term, 1896, and on the first day of the January Term, 1897, the plaintiff in error in that case, whose writ of error had been dismissed, made his application to recall the mandate and reinstate the cause on the docket of the Supreme Court, not for the purpose of reconsidering and correcting any error or miscarriage of justice in the Supreme Court's judgment which had been rendered at the previous term, but in order that the plaintiff in error himself might correct his own record in such manner that his writ of error might be successfully prosecuted.

All that the case of Merchants' National Bank v. Grunthal decides is that the Supreme Court has no further jurisdiction over a case to recall the mandate or to grant a rehearing or other relief therein *after the expiration of the term at which the judgment was rendered.* To this rule I heartily agree because it is in harmony with the rule prevailing in all jurisdictions, but such case is not authority for the proposition that the Supreme Court has no power during the *same* term to recall its mandate and grant a rehearing or other relief therein merely because the mandate has been issued and filed in the Circuit Court pursuant to a rule which provides for the mandate to issue in advance of the end of the term.

This court has only recently said that while it is important to dispose of cases here speedily, it is more important that such cases should be decided justly.

This being true, it would seem that the public policy which demands that there must be an end to litigation, requires that litigation must not be ended at the expense of producing a miscarriage of justice by the refusal of this court to exercise the power, which every court in this country has always acknowledged, to the effect that every

court of general jurisdiction retains jurisdiction over its own judgments until the end of the term, in the absence of some statute which cuts it off short of that time.

The rule announced in the Lovett case also embraces the idea that the time allowed by statute or court rule for making application for a rehearing must have passed with no application for a rehearing applied for within the time allowed to the parties thereof. This decision, of course, means no more than that where the court here prescribes a rule limiting the time for applying for a rehearing, it has the force and effect of a statute, and should be observed and adhered to by the court as such where no rehearing has been applied for within the rule just as statutes are complied with, because the parties to the litigation have a vested interest in having the rule observed, which vested interest goes to the jurisdiction of the court to proceed.

In Johnson v. McKinnon, 54 Fla. 221, 45 Sou. Rep. 23, 13 L. R. A. (N. S.) 874, 127 Am. St. Rep. 135, 14 Ann. Cas. 180, the substance of this judicial requirement was expressed by this court as follows:

> "Though a court may possess jurisdiction of the cause, of the subject matter and of the parties, it is still limited *in its mode of procedure* and in the extent and character of its judgment."

In the case at bar the losing party promptly made his motion for a rehearing within the time and in accordance with the rules of this court. So far as the appellees are concerned, the appellees have done everything within their power to procure the rendition of a proper judgment by the Supreme Court of Florida. But assuming (not deciding as we have heretofore stated) that the Supreme Court of Florida has erroneously denied the appellees' petition for a rehearing, and by reason thereof the appellees have suffered a miscarriage of justice at the hands of this Court, is it sound for this Court to announce a rule to the effect that there is no *power* in this Court to correct

its own error, and that this Court must aid in the perpetration of a miscarriage of justice against the appellees by requiring the court below to carry out this Court's erroneous judgment, merely because tis Court has adopted a rule under which mandates are sent out by the clerk before the time that this Court would ordinarily lose control over its judgments during the same term?

It seems to me that the correct rule on this subject is that adopted and followed by the Court of Appeal of the State of New York. That Court has held that although all the appellate jurisdiction of a case is lost by the filing of the mandate of the appellate court in the lower court, and that the lower court thereupon is reinvested with the complete jurisdiction to proceed with the cause, nevertheless the appellate court by virtue of retaining jurisdiction over its own judgments during the same term, retains jurisdiction to recall its own mandates and, after having recalled its own mandate, to reassume jurisdiction as an appellate court in the case in order to review its former decision and correct whatever error it, as an appellate court, may have committed therein. See Cordozo on Court of Appeals, Section 133; Franklin & Co. v. Mackey, 158 N. Y. 683, 51 N. E. 178.

The case of Ott v. Boring, decided by the Supreme Court of Wisconsin, 111 N. E. 833, it is true, criticised the holding of the Court of Appeals of New York, as pointed out by MR. JUSTICE ELLIS. It will be noted, however, that that the Supreme Court of Wisconsin was not at all unanimous in so doing, and that when the Supreme Court of Wisconsin really came down to disposing of its own case involving the same proposition in that court, it rested its own decision upon a *statute* of the State of Wisconsin, which the Court expressly held cut off the jurisdiction of that Court over its own judgments prior to the end of its term.

A short quotation from the opinion in that case is pertinent on this point:

"Generally, too, it is held, in the absence of statute, that the power of an appellate court over its judgment, like that of courts generally, persists to the end of the term at which the judgment is rendered, and then absolutely terminates, except as it may be terminated earlier by the retransmission of the cause to the trial court. * * * In Pringle v. Dunn, 39 Wis. 435, it was first definitely reasoned that the statute requiring the remission of the record within thirty days took away the previously existing inherent jurisdiction of the court over its judgments throughout the remainder of the term. * * * In the light of these decisions of our own court, we cannot avoid the conviction that the rule has been thoroughly adopted that, when the record upon an appeal has been regularly transmitted to and filed with the court from which it originally came, this court's jurisdiction over the cause and also to vacate or modify its own judgment is at an end; *that the effect of the statute* is to impose upon the clerk the duty, as an officer of the law, to transmit the record at any time within sixty days after the decisions of the court, subject, within that period, to such order as the court may make in protection of proper opportunity to make motions for rehearing, whether strictly such or of that nature, so that, whenever the clerk, without the disobedience of any such order or rule of court, does as in this case, transmit the record within the sixty days, it is regularly and lawfully transmitted, and the jurisdiction of this court is terminated. It should perhaps be said, for certainty, that this limitation upon the power of the court to grant rehearing or to vacate or modify its judgment has no relation to that other power, existent in all courts and at all times, to correct the mere record of the judgments which they render so as to make the record properly express the judgment." (Emphasis mine).

In Florida we have no such statute as prevails in Wisconsin. Consequently, as the Wisconsin Court itself states, the rule is that the power of this court as an appellate court

remains over its own judgment like that of courts generally, to the end of the term at which the judgment is rendered, and then absolutely terminates.

It seems to me, therefore, that if this Court has occasioned a miscarriage of justice by erroneously denying to the appellees a rehearing which was seasonably applied for within the time limited by our court rules, that in so far as mere *power* or jurisdiction of this Court is concerned, that this Court does have and retain jurisdiction to recall its own mandate from the Circuit Court for the purpose of reinvesting itself with jurisdiction over the cause in order to consider appellees' petition for rehearing, when necessary to avoid a miscarriage of justice which may be imminent, it appearing that all these proceedings have transpired during the June Term, 1931, of this Court at which time the judgment of reversal was rendered and the appellees' petition for a rehearing was denied.

WHITFIELD, J., concurs.

BROWN, J. (Concurring specially).—I concur in the main with the views above ably expressed by Mr. Justice DAVIS. They are, as I understand them, in harmony with the opinion in Washington v. State, 92 Fla. 740, 110 So. 259, though the exact question here presented was not involved in that case. In the opinion in the Washington case, there is a quotation from the case of Trustees of I. I. Fund v. Bailey, 10 Fla. 238, in which it was said by this court that: "The judgment of this court, during the term at which it was pronounced like any other order, may be vacated, corrected and changed." I seriously doubt if this power of the Supreme Court over its own judgments and orders, during the term within which they are rendered, could be taken away even by a legislative act. There is an expression in Mr. Justice Davis's opinion which reminds me of the humorous observation of Chief Justice Blackley, of Georgia, made some fifty years ago, to the

effect that ''Appellate Courts exist to correct the errors of other courts, while adhering strictly to their own.'' There would be more truth than humor in this remark if an appellate court could not correct its own errors during the same term. I think the expressions to the contrary in the Grunthal and Lovett cases should be overruled.

Order granting rehearing entered January 27, 1932.

PER CURIAM.—The mandate in this case having been ordered recalled on January 6th, 1932, and the cause reinstated upon the docket for further consideration of the judgment to be entered herein, it is now ordered that a rehearing be granted in this cause, with privilege to either of the parties to file briefs and reply briefs on the merits, within thirty days, copies to be served upon opposing counsel, the briefs and arguments to eliminate from consideration any contention that trust property held by a church or religious society is exempt from mechanic's lien under the statutes applicable thereto and referred to in the original opinion filed in this cause. The original opinion of the court on this subject is adhered to on this rehearing, insofar as the applicability of the mechanic's lien laws to the facts shown of record is concerned.

BUFORD, C.J., AND WHITFIELD, ELLIS, TERRELL, BROWN AND DAVIS, J.J., concur.

---

ON REHEARING.

Opinion filed January 9, 1933.

PER CURIAM.—This case was decided July 21, 1931, by an opinion filed in which it was held that the decree appealed from should be reversed and the cause remanded, *with directions to enter a decree for the complainant in accordance with the views expressed in that opinion.* See foregoing opinion in Chapman v. St. Stephens Protestant Episcopal Church, 136 Sou. Rep. 238.

On the 6th day of January, 1932, we ordered the man-

date recalled for the purpose of reconsidering the case on a petition for rehearing, and a rehearing has been granted. See foregoing opinion in Chapman v. St. Stephens Protestant Episcopal Church, 138 Sou. Rep. 630.

A reconsideration of our previous opinion convinces us that we were not in error in adopting the Commissioner's opinion as the law of the case, nor in reversing the decree appealed from in accordance with that opinion. But we are convinced that the reversal should have been without directions to enter a decree for complainant on the record as made.

Where the testimony submitted to a chancellor is not sufficient on some point to authorize a just decree in the cause, and it clearly appears from the record that testimony does not exist on such point sufficient to enable the court to make a just decree, the cause will be remanded with directions to take further testimony on such point. Morgan v. Dunwoody, 66 Fla. 522, 63 Sou. Rep. 905; Graham v. Florida Land & Mtge. Co., 33 Fla. 356, 14 Sou. Rep. 796; Fuller vs. Fuller, 23 Fla. 236, 2 Sou. Rep. 426; Rain v. Roper, 15 Fla. 121.

Under the circumstances the proper judgment of this Court should now be, that the decree appealed from be reversed but with directions to reopen the cause, permit such further pleadings to be filed therein as the parties might be advised should be filed, and permit further testimony to be taken, and have such further proceedings in the cause below as will accord with the law of the case as declared in our first opinion considered in the light of the record as it appears at such further hearing in the Court below. See Winton v. Stone, decided at the present term.

Oral argument is unnecessary with respect to the foregoing disposition that should be made at this time. The Court is fully advised from its previous consideration of

the briefs and record that the cause should be disposed of as hereinbefore indicated.

It is ordered that a mandate do issue accordingly.

BUFORD, C.J., AND WHITFIELD, TERRELL, BROWN AND DAVIS, J.J., concur.

ELLIS, J., absent on account of sickness.